# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JERRY L. FONTENOT,            § | | |
|     Plaintiff, § | | |
| § | | |
| v. § | CIVIL ACTION NO. H-06-2610 | |
| § | | |
| GROUP 1 AUTOMOTIVE, INC. § | | |
| EMPLOYEE DISABILITY PLAN and § | | |
| THE PRUDENTIAL INSURANCE § | | |
| COMPANY OF AMERICA, § | | |
|     Defendants. § | | |

## MEMORANDUM AND ORDER

Plaintiff seeks in this ERISA[1] case to vacate the termination of long-term disability benefits.  The case is before the Court on Group 1 Automotive, Inc. Employee Disability Plan's and The Prudential Insurance Company of America's ("Prudential") (collectively, "Defendants") Motion for Summary Judgment [Doc. # 16].  Plaintiff Jerry L. Fontenot ("Fontenot") has responded [Doc. # 21], and Defendants have replied [Doc. # 22].  Having considered the parties' submissions, all matters of record, and applicable legal authorities, the Court concludes that Defendants' Motion should be **granted**.

---

[1]   Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq.*

## I.     BACKGROUND

In August 2000, Fontenot was hired by Group 1 Automotive, Inc. ("Group 1 Automotive") as an automobile technician. Administrative Record ("A.R.") [Doc. # 15], 1, 361. As a benefit of employment, Fontenot was provided with long term disability ("LTD") coverage under The Group 1 Automotive, Inc. Short and Long Term Disability Coverage for All Employees Welfare Benefit Plan (the "Plan").[2] Prudential insures the Plan pursuant to Group Insurance Contract No. G-33628 issued to Group 1 Automotive ("the Policy").

Under the terms of the Plan, a covered employee must be deemed "disabled" for 180 days before he is eligible to receive LTD benefits. A.R. at 479. Initially, an employee is considered "disabled," and thus entitled to LTD benefits, if Prudential determines, among other requirements, that he is unable to perform the material and substantial duties of his regular occupation due to sickness or injury. *Id*. at 478. After 24 months of LTD payments, however, the employee is entitled to further benefits only if he is "unable to perform the duties of any gainful occupation for which [he is] reasonably fitted by education, training, or experience." *Id*.

---

[2]     A copy of the Policy is attached to the Motion as Exhibit 1-A. A Group Booklet Certificate, Exhibit 1-B to the Motion, details the LTD coverage to which employees of Group 1 Automotive may be entitled, the persons to whom Prudential may make payments, and the limitations, exclusions, and requirements that apply within the Plan.

On or about June 18, 2001, Fontenot submitted a claim for LTD benefits alleging that he had been unable to work since April 10, 2001 because he was recovering from arthroscopic surgery to his right knee. A.R. at 1-5. In conjunction with this claim, Fontenot submitted medical records and reports from Drs. Marshall W. Hayes and Curtis D. Thorpe indicating his inability to squat or perform other activities involving the bending of his knee. *Id*. at 237, 241-43, 245, 247. Because Fontenot's job description required a full range of movement, including the ability to squat and bend, Prudential determined that Fontenot was unable to perform the material and substantial duties of his regular occupation. *Id*. at 3. He was awarded LTD benefits with an effective date of October 7, 2001. *Id*. at 6.

Dr. Thorpe performed a second surgery on Fontenot's right knee on January 31, 2002. A.R. at 197-98. After Fontenot complained of further pain and Dr. Thorpe suggested he see a pain specialist, Fontenot began seeing Dr. B.T. Wright, Jr. *Id*. at 204. Fontenot continued to complain of knee pain so Dr. Wright performed a third arthroscopic surgery of the right knee on March 21, 2003. *Id*. at 126-27.

On April 27, 2003, Fontenot completed an "Activities of Daily Living Questionnaire." A.R. at 163-70. Fontenot reported he completed activities such as preparing his own meals daily and performing 4-5 hours of housework weekly. *Id*. at 165-66. He indicated that he read magazines approximately 2 hours each week and

was responsible for the financial management of his household, including the paying of monthly bills. *Id*. at 165, 166. Finally, Fontenot reported that an application for Social Security Disability Benefits had been denied, although an appeal was pending. *Id*. at 169.

On June 9, 2003, orthopedic surgeon Martin R. Haig saw Fontenot for an independent medical examination. A.R. at 154-56. Based on the medical records and his examination, Dr. Haig opined that Fontenot was prevented "from doing heavy work and the job of an automobile mechanic" but that he could perform medium and light type work so he "[was] not disabled from any and all occupations." *Id*. at 156.

On June 21, 2003, Thomas Virgilio performed a Transferable Skills Analysis ("TSA") for Prudential to determine whether there were jobs available in the local labor market that Fontenot could perform given the physical restrictions identified by Dr. Haig. A.R. at 333. Virgilio considered Fontenot was a high school graduate and that he had transferable skills based on his prior occupation as an auto mechanic. Virgilio then determined the following jobs Fontenot qualified for based on his analysis: bicycle assembler, small product assembler, electronics worker, oil change mechanic, auto accessory salesperson, and convertible top installer. *Id*.

On September 16, 2003, Prudential advised Fontenot that after 24 months of payments, his claim would be evaluated under the more restrictive "any occupation"

definition of disability, and benefits would be terminated unless Fontenot could not work in any gainful occupation.  A.R. at 409.  Under the stricter standard, Dr. Haig and Virgilio determined Fontenot had functional capability to be gainfully employed, and Prudential terminated his LTD claim effective October 7, 2003.  *Id.* at 410.

Fontenot appealed the termination decision on October 10, 2003.  A.R. at 146-47.  Plaintiff's medical records were reviewed by Paula Arbadji, who determined Fontenot had the functional ability to perform the duties of a sedentary to light duty occupation.  *Id.* at 339.  Virgilio performed a second TSA and determined that Fontenot could work as a vehicle maintenance scheduler, repair order clerk, or a service order clerk.  *Id.* at 340.  Because Fontenot was not disabled from performing any occupation, the termination decision was upheld.  *Id.* at 416, 417.  Fontenot was advised of the decision by letter dated November 7, 2003 and was invited to contact Prudential for job placement services.  *Id.*

On November 25, 2003, Fontenot appealed the decision a second time and submitted additional medical documentation.  A.R. at 99.  Because the medical records indicated Fontenot was capable of performing sedentary work prior to his next, scheduled surgery (Fontenot's fourth) and therefore could be gainfully employed, the termination decision was upheld by a letter dated December 23, 2003.  *Id.* at 422-23.  On March 9, 2004, Fontenot's attorney filed a third request for

reconsideration of the termination decision and submitted additional records from Dr. Wright and reports from the fourth surgery. *Id*. at 84-85.

After Prudential's medical director determined that recovery for bilateral knee arthroscopic surgery was 16-18 weeks, Prudential granted Fontenot an additional period of benefits from October 7, 2003 through May 31, 2004. A.R. at 347, 426. Fontenot was advised of this decision by letter dated March 30, 2004. *Id*. at 426-27.

Fontenot was referred to Dr. Kevin G. Smith, Ph.D.[3] for a pre-operative psychological evaluation for a possible spinal cord stimulator trial. *Id*. at 34. Following psychological examinations and testing, Dr. Smith reported Fontenot exhibited mild to moderate depressive symptoms and reluctance to return to work because of a learning disorder. *Id*. at 37.

On April 8, 2004, Fontenot's attorney advised Prudential that the Social Security Administration had denied his claim for Social Security Benefits on appeal. A.R. at 10. On July 29, 2004, Fontenot's attorney wrote a letter requesting resumption of Fontenot's LTD benefits. *Id*. at 75.

On November 19, 2004, Dr. Richard Day performed a clinical review of Fontenot's medical records for Prudential and concluded Fontenot had capacity to work at a sedentary job that permitted positional changes. A.R. at 350-51. On

---

[3] Dr. Smith is not a medical doctor.

November 23, 2004, Virgilio performed a vocational rehabilitation review to determine whether the presence of a learning disability would impact Fontenot's ability to return to work in the sedentary occupations which had previously been identified. *Id*. at 353. Based on the Department of Labor's Dictionary of Occupational Titles ("DOL Dictionary"),[4] Virgilio concluded that Fontenot had previously demonstrated an ability to read at a level equal or greater than what is required by the identified alternative occupations and that all identified occupations were performed at a lower skill level than what Fontenot had previously demonstrated. *Id*. at 354.

Prudential's final review of Fontenot's eligibility concluded that he was able to perform a gainful occupation. *Id*. at 433-35. Prudential's review acknowledged Dr. Smith's conclusion that Fontenot's IQ was "borderline functional," and "that a learning disability for reading skills could impact Mr. Fontenot's ability to return to a sedentary or light work." *Id*. at 434. Because "Mr. Fontenot has previously demonstrated an ability to read at a level which is equal to or greater than what is required by the occupations that were identified in our vocational assessment," and because the identified occupations required a lower skill level than Fontenot's prior employment, Prudential again upheld the termination decision. *Id*.

---

[4] The DOL Dictionary is not part of the Administrative Record.

## II.     APPLICABLE LEGAL PRINCIPLES

### A.     Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case for which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322-23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are

resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). Instead, the nonmoving party must present specific facts that show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations

omitted); *see also De la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 501 (5th Cir. 2005).

## B. ERISA Standards

The denial of benefits under an ERISA plan is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Lain v. UNUM Life Ins. Co. of America*, 279 F.3d 337, 342 (5th Cir. 2002). If the plan grants to the administrator such discretionary authority, the reviewing court applies an "abuse of discretion" standard. *Meditrust Financial Services Corp. v. The Sterling Chemicals, Inc.*, 168 F.3d 211, 213 (5th Cir. 1999).

"In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously." *Meditrust,* 168 F.3d at 214 (internal quotations and citations omitted). "When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we affirm an administrator's decision if it is supported by substantial evidence. A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* at 215 (internal quotations and citations omitted); *Lain*, 279 F.3d at 342. The administrator abuses its discretion if its decision is not

supported by substantial evidence in the administrative record and is erroneous as a matter of law. *Wilbur v. Arco Chem. Co.*, 974 F.2d 631, 646 n. 12 (5th Cir. 1992); *see also Vega v. Nat'l Life Ins. Services,* Inc., 188 F.3d 287, 302 (5th Cir. 1999) ("Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion.").

The Fifth Circuit applies a "sliding scale" approach to benefits denials made by an administrator that is also the insurer. *Vega*, 188 F.3d at 297; see *Lain* 279 F.3d at 342-43 (concluding abuse of discretion standard of review applied to administrator's findings of fact, but that the ultimate denial of benefits would be reviewed *de novo*; stating that "sliding scale" would be applied to the abuse of discretion standard where the administrator acted under a conflict of interest). "The greater the evidence of conflict on the part of the administrator, the less deferential [the courts'] abuse of discretion standard will be." *Lain*, 279 F.3d at 343 (quoting *Vega*, 188 F.3d at 297). "When a minimal basis for a conflict is established, we review the decision with 'only a *modicum less* deference than we otherwise would.'" *Id.* (quoting *Vega*, 188 F.3d at 301) (emphasis added by *Lain*, 279 F.3d at 343); *see MacLachlan v. ExxonMobil Corp.,* 350 F.3d 472, 479 (5th Cir. 2003, *cert. denied*, 541 U.S. 1072 (2004)).

## III.  ANALYSIS

Prudential contends that it did not abuse its discretion when terminating Fontenot's LTD benefits, because there was substantial evidence that Fontenot could be gainfully employed at occupations other than the one he had previously.  Because Prudential serves as the insurer as well as the claim administrator charged with determining eligibility, Prudential is under a conflict of interest.  The Court will use the "sliding scale" approach and afford Prudential's decision less deference than would otherwise apply.

Initially, the Court addresses Fontenot's claim that Prudential abused its discretion because it presumed that Fontenot was capable of a level of literacy based on his past employment and not from "concrete evidence" in the administrative record.  Fontenot claims the record contains objective testing which shows he has learning disabilities and that his ability to read is at a third grade level.[5]  Fontenot asserts that this literacy presumption underlay Virgilio's review of whether his learning disability impacted his ability to work an alternative job, and that there is not substantial evidence in the record to support Prudential's reasoning and the resulting denial of benefits.

---

[5]   Plaintiff's Reply, at 4 (citing A.R. at 37).

The Fifth Circuit requires the reviewing court to determine if the administrative "record adequately supports the administrator's decision." *Vega,* 188 F.3d at 298. The analysis is whether the administrator "conduct[ed] a good faith, reasonable investigation." *Id.* ("If we placed a duty on conflicted administrators to reasonably investigate, we would be adopting the presumptively void standard of the Eleventh, Eighth, and Third Circuits."). Under the procedures set out by the Fifth Circuit, "the plan administrator has the obligation to identify the evidence in the administrative record and . . . the claimant may then contest whether that record is complete." *Vega,* 188 F.3d at 299 (citations omitted). If the claimant submits additional information to the administrator and requests that the administrator reconsider his decision, that additional information should be treated as part of the administrative record. *Id.* at 300 (holding that "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it").

Prudential originally terminated Fontenot's claim for LTD benefits after 24 months because the medical evidence supported the finding that Fontenot could be gainfully employed in jobs such as bicycle assembler, small product assembler, electronics worker, oil change mechanic, auto accessory salesperson, and convertible top installer — light or medium jobs for which Fontenot qualified based on functional

limitations, education, training, and experience. Prudential made this termination decision based on findings derived from Fontenot's "Activities of Daily Living Questionnaire,"[6] orthopedic surgeon Martin R. Haig's June 9, 2003, independent medical examination, reviews of Fontenot's medical records,[7] and Virgilio's TSA in which he considered Fontenot's education as a high school graduate, transferable skills from being an auto mechanic, and his level of literacy. Prudential did not abuse its discretion in deciding that Fontenot, despite his learning disability, could still perform the identified types of alternative jobs.

Fontenot appealed this determination on October 10, 2003, claiming that Dr. Haig had not commented on a set of MRIs completed on January 25, 2003, or on the more recent surgery of May 21, 2003. Fontenot submitted the referenced records plus additional records from Dr. Wright. Fontenot also submitted new reports of MRIs taken on October 17, 2003, and evidence that Fontenot continued to be on pain medication and restricted activity. Based on material including a review by Paula

---

[6] In this questionnaire, Fontenot reported preparing daily meals, performing 4-5 hours of housework weekly, shopping for groceries alone, engaging in 2 hours per day in child-care activities, reading magazines 2 hours per week, and bearing responsibility for financial management of his household including the paying of monthly bills.

[7] Dr. Haig noted Fontenot's complaints of pain but concluded that Fontenot was prevented "from doing heavy work and the job of an automobile mechanic" but he "[was] not disabled from any and all occupations" because he could perform medium and light type work that did not involved heavy bending, twisting or crouching.

Arbadji of all Fontenot's medical records,[8] and a second TSA by Virgilio, which indicated Fontenot could work as a vehicle maintenance scheduler, repair order clerk, or a service order clerk, Prudential upheld its termination decision.

On November 25, 2003, Fontenot again appealed the termination decision and submitted still more medical documentation from Dr. Wright. The latest material revealed that Fontenot was to undergo a fourth surgery on December 29, 2003. Based on additional medical records from Dr. Wright,[9] Prudential eventually extended Fontenot's benefits through May 31, 2004.[10]

Fontenot appealed for the third time on July 29, 2004, and submitted additional records from Dr. Seifert, Dr. Smith, Dr. Wright, and a physical therapist. Prudential again upheld its termination decision after considering several further reviews of these records and Fontenot's condition and circumstances. Prudential relied on a

---

[8] Arbadji explained her determination that Fontenot had the functional ability to perform full-time duties of a sedentary to light duty occupation, so long as the work was limited to one-half day of standing and lifting, with no crouching, kneeling, excessive climbing, twisting, or rotating. *See* A.R. at 339.

[9] Dr. Wright completed a Disability Certificate on March 2, 2004, stating Fontenot was still unable to return to work as he was "totally incapacitated" from 6/1/03 to 5/30/04, a conclusion he reached notwithstanding his observation on January 12, 2004, that Fontenot had "improved to the point where he is walking around without cane and crutches."

[10] Initially, the termination decision was upheld based on Dr. Kowalski's review of medical records which indicated that Fontenot was not precluded from sedentary work with the limitations of no squatting, turning, twisting, or lifting of greater than 20 pounds. On March 9, 2004, Fontenot's attorney filed a third request for reconsideration of the termination decision, which resulted in this favorable ruling for Fontenot.

clinical review of Fontenot's medical records by Dr. Richard Day.  Dr. Day spoke with Fontenot's psychologist, Dr. Smith, who opined that Fontenot's learning disability impacted his return to work.  Dr. Day reported that Dr. Smith felt "the learning disability (reading skills) is impacting [Fontenot's] return to work efforts." A.R. at 351.  This is consistent with Dr. Smith's own report, which concluded on June 28, 2004, that Fontenot's "combination of physical disabilities and learning disabilities in combination make it highly unlikely that this patient would be able to succeed in a competitive work environment."  A.R. at 38.  Dr. Day noted, however, that Fontenot was ambulatory and walked without crutches or a limp.  He opined that it "would be reasonable that sedentary capacity does exist especially if positional changes are possible (sit/stand)."  A.R. at 351.

Prudential at this time also relied on a vocational rehabilitation review conducted on November 23, 2004, by Virgilio which specifically took Dr. Smith's opinion into account and focused on whether a learning disability would impact Fontenot's return to work in the identified sedentary occupations.  A.R. at 353. Virgilio considered the DOL Dictionary, which characterized an automobile mechanic position as "skilled work" requiring 2 - 4 years of training and Language Level 3 skills, and for which Fontenot had demonstrated proficiency.  The sedentary occupations of maintenance scheduler and repair order clerk required Language Level

3 skills and were only "semi-skilled work." Service order clerk is also "semi-skilled" and requires Language Level 2. Virgilio concluded that Fontenot previously had demonstrated an ability to read at a level equal or greater than that required by the alternative occupations, and all the alternatives were at a lower skill level than the level Fontenot had previously demonstrated.

Fontenot argues that the above facts do not constitute sufficient "concrete evidence" that he is sufficiently literate for the proposed alternative occupations because there is no evidence in the administrative record that he actually performed the full range of tasks that the DOL Dictionary indicates automobile mechanics must be able to read to perform. *See Vega*, 188 F.3d at 302. Fontenot argues that, as a practical matter, his prior occupation required little or no literacy, despite the DOL Dictionary description upon which Virgilio relied. This argument is unavailing. *Vega* requires "the administrator's decision to be based on evidence, *even if disputable*, that clearly supports the basis for its denial." *Id.* at 299 (emphasis added). Fontenot's dispute with the evidence Virgilio relied on does not eliminate that evidence from the record. Prudential was permitted to rely on this authoritative source as part of the basis for its termination decision.[11] Moreover, the administrative

---

[11] While not binding here, the Fifth Circuit has explicitly held in the analogous context of social security appeals that Administrative Law Judges "may rest on descriptions of past work as actually performed *or* as generally performed in the national economy," and that "may take

decision also is supported by other evidence, such as Fontenot's self-reported habit of reading magazines several hours a week and a high school education.

Prudential has presented substantial evidence in the administrative record for the decision to terminate Fontenot's benefits. There exists a rational connection between the decision to terminate benefits and the evidence that Fontenot could be gainfully employed in alternative occupations. "When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, the court must affirm an administrator's decision if it is supported by substantial evidence. A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust,* 168 F.3d. at 215 (internal quotations and citations omitted); *Lain*, 279 F.3d at 342. The administrator abuses its discretion if the decision is not supported by substantial evidence in the administrative record and is erroneous as a matter of law. *Wilbur*, 974 F.2d at 646 n. 12; *see also Vega*, 188 F.3d at 302.

Because there is "concrete evidence" in the administrative record supporting Prudential's decision, and because the termination was rationally connected to that

---

notice of job data in the Dictionary of Occupational Titles" as evidence of the job as performed in the national economy. *Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990).

evidence, there is no genuine question of material fact remaining in this case. Summary judgment is appropriate in the Defendant's favor.

## IV.    CONCLUSION

Fontenot has failed to raise a genuine issue of material fact that Prudential abused its discretion in terminating Fontenot's long term benefits and Prudential is entitled to summary judgment on Plaintiff's claims. Accordingly, it is hereby

**ORDERED** that the Defendant's Motion for Summary Judgment [Doc. # 16] is **GRANTED**. The Court will issue a separate final judgment.

**SIGNED** at Houston, Texas, this **22nd** day of **August, 2007**.

_____
Nancy F. Atlas
United States District Judge